United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALI OMAR POLK,

          Petitioner,

    v.

KATHLEEN DICKINSON, Warden,

          Respondent.

_____/

No. C 10-5529 PJH

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

      Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner, Ali Omar Polk ("Polk"). Having reviewed the parties' papers, the record, and having carefully considered their arguments and the relevant legal authorities, the court DENIES the petition.

## BACKGROUND

**A.    Procedural Background**

      In 2007, a jury in the Alameda County Superior Court convicted Polk of second-degree murder, possession of a firearm by a felon, and several firearm enhancements. The court sentenced Polk to fifteen years to life in prison on the murder conviction, and added twenty-five years for one of the firearm enhancements, resulting in an aggregate sentence of forty years to life in prison.

      Polk appealed to the California Court of Appeal, which affirmed his conviction and sentence on May 29, 2009. The California Supreme Court denied review on September 9, 2009. Polk filed the instant federal habeas petition on December 6, 2010.

United States District Court

For the Northern District of California

**B.   Factual Background**

On June 23, 2005, Polk shot the victim, DeAndrew Smith ("Smith"), while Smith was sitting on the front porch of his Oakland residence, which he shared with several people. Immediately prior to the shooting, Smith was sitting on the porch with Dajuan Gross ("Dajuan") when Polk walked up.[1]   Dajuan recognized Polk from the neighborhood, and was aware that Polk and Smith had had a dispute recently.   Dajuan whispered to Smith, "Here he come," as Polk approached.

According to Dajuan, Polk walked up the front steps and demanded money from Smith, to which Smith responded, "You'll get it when I get it."   Dajuan heard the sound of a bullet being chambered in a gun, and got up and tried to go inside the house.   As he did, he heard three or four shots, turned, and saw Smith lying on the porch.   He heard a second series of shots, after which Dajuan ran to a neighbor's house and called 911.   In addition to Dajuan, the shooting was also witnessed by Dajuan's sister, Ebonique, who was with Dajuan and Smith on the porch when Polk came over.   When the police arrived, Smith was semi-conscious with several bullet wounds.   He fell into a coma and died several days later.

*Prosecution Case*

At trial, in addition to the above testimony from Dajuan, the prosecution presented the following evidence in the form of testimony from witnesses and from prior statements witnesses provided to police officers after the shooting.[2]   Smith was a close friend of Dajuan's and was living at the Oakland residence, which apparently belonged to Dajuan's grandparents, the Keys ("the Keys residence").   Smith had apparently been dealing drugs from the residence.   Two days prior to the shooting, Ebonique heard Smith and Polk

---

[1]Eyewitness Ebonique Gross, Dajuan's sister, testified that another man, "Taco," was also present on the porch at the time of the shooting.   As discussed below, her testimony was contrary to Dajuan's.

[2]Soon after the shooting, several of Smith's friends and neighbors gave statements to the police.   However, at trial, many of the witnesses, including Ebonique, recanted or "forgot" their prior statements.

United States District Court

For the Northern District of California

1    arguing about what she understood to be prostitutes.  Polk then told Smith not to be there

2    when he returned, and drove off in a Jaguar.  The next day, the day prior to the shooting,

3    Ebonique saw Polk across the street from the Keys residence.  She approached Polk and

4    asked him to sell her drugs, to which Polk responded that he wasn't "over here" for that,

5    and "you know what I'm over here doin'."  Exh. 8 at 8.  Ebonique subsequently went into

6    the Keys house and told Smith about her interaction with Polk.

7         The next day, the day of the shooting, Ebonique stated that she was on the porch

8    with Dajuan and Smith, and that none of them had a weapon.  She observed Polk come

9    over and demand money from Smith, claiming that Smith had damaged his car.  Smith

10   denied damaging the car, and, regarding the car, told Polk to "[a]sk one a your females."

11   *Id.* at 9.  Polk again demanded money, which Smith refused.  Polk then shot Smith several

12   times, ran out of the yard, passing a neighbor, Zachary Thompson.  Thompson asked Polk

13   what had happened, and Polk told him not to worry about it because he "just shot in the

14   air."

15        At trial, however, Ebonique changed the above story she told officers immediately

16   after the shooting.  Initially, when called as a prosecution witness at trial, she refused to

17   testify.  R.T. 785-86.  The trial court held her in contempt and ordered her jailed for the

18   night.  As she left the courtroom, she told Polk, "I'm not going to tell on you, dude."  R.T.

19   989-90.  Ebonique subsequently agreed to testify the next day.  At trial, she testified,

20   contrary to her prior statement, that she left to go to the store shortly before the actual

21   shooting and did not witness the shooting.  She also testified that prior to the shooting,

22   another man, "Taco," was present on the porch and that both Smith and Taco had

23   weapons at the time.  Additionally, Ebonique testified that Smith had threatened Polk with a

24   shotgun in the days immediately prior to the shooting.

25        Contrary to Ebonique's trial testimony, her brother, Dajuan denied knowing anyone

26   named "Taco."  R.T. 344.  He also denied observing Smith with a weapon at the time of the

27   shooting.  R.T. 320-21, 344-46.

28

3

**United States District Court**
For the Northern District of California

1    The prosecution also introduced prior statements and/or testimony from neighbors

2    Cindy Williams and Zachary Thompson, and from Jamena Levi, the mother of Smith's

3    children. Williams testified that the night before the shooting, she saw Polk holding a

4    shotgun and talking to a known drug dealer outside of her house.  On the evening of the

5    shooting, Williams attested she saw Polk running down the street, dressed in black, and

6    putting something in his waistband.  She went outside and down to the Keys house, where

7    she saw people congregating and Smith lying on the porch.

8    Thompson invoked the Fifth Amendment when he was asked about the shooting

9    while on the witness stand.  After the trial court ordered him to answer the questions, he

10   denied knowing anything about the shooting, but admitted giving a statement to police soon

11   after the shooting.  In his recorded statement, which was introduced at trial, Thompson

12   stated that he was walking near the Keys residence on the night of the shooting, heard four

13   or five gunshots, and then saw Polk running down the street dressed in black clothing.

14   When Thompson asked what happened, Polk said, "only in the air."  Thompson then

15   walked around the corner, observed Smith lying on the porch, and "put two and two

16   together."  Exh. 9.

17   Smith's children's mother, Levi, testified that she was driving to the Keys residence

18   when she heard shots fired.  R.T. 512-13.  She testified that she had seen Smith the day

19   before he was killed, and that he was acting strangely, "like he knew something was going

20   to happen."  R.T. 545.  After hearing the shots, Levi saw people running, including "Taco,"

21   but she did not observe anyone with a weapon.  R.T. 548, 558.  Her cousin, Zachary

22   Thompson, told her that Smith had been shot, and that he saw Polk running from the

23   scene.  Levi had previously heard from some of Smith's friends that Polk and Smith were

24   having a problem.  R.T. 545.

25   In addition to the above, the prosecution also introduced evidence that suggested

26   Polk was a pimp, and that the shooting was triggered by an argument regarding Polk's

27   pimping activities.

28

4

United States District Court
For the Northern District of California

1  During its closing argument, the prosecution argued that there were a number of

2  factors that demonstrated that the shooting was intentional and deliberate, and that Polk

3  had not acted out of self defense.  It pointed out numerous inconsistencies in Polk's

4  testimony, and argued that between eyewitnesses Dajuan and Ebonique, Dajuan's

5  testimony was more believable because unlike Ebonique, he had not altered his story from

6  the time of the shooting until trial.

7  *Defense Case*

8  Polk was the primary witness and testified on his own behalf at trial.  He admitted to

9  shooting Smith, but claimed that it was in self-defense.  He also admitted that he had two

10 felony convictions for selling drugs, that he had been on probation at the time of the

11 shooting, and that his probation conditions prohibited him from possessing firearms and

12 from entering Oakland's 79th Avenue neighborhood, where the Keys residence was

13 located.

14 Polk testified that he grew up in the Oakland Hills neighborhood, but spent a lot of

15 time on 79th Avenue in Oakland.  He admitted that he often bought drugs from friends in

16 the area for resale, and that he earned approximately $3,000 per month selling drugs.  He

17 also testified that he was an "executive producer," of a music company, admitted that he

18 did not pay taxes on his earnings, and stated that he drove a green Jaguar and a Harley

19 Davidson motorcycle, which had been purchased by his mother.  He admitted to fathering

20 four children with three women and that he had never married.

21 Polk testified that he had gone to Smith's house a few days before the shooting, and

22 that Smith was sitting on the porch with a shotgun, making strange comments.  Polk

23 returned to the 79th Avenue area the next day to sell drugs, and brought a handgun for

24 protection.  He went to the Keys house, where he claimed that Smith became hostile, and

25 grabbed a shotgun, and asked Polk what he was laughing at.  Polk and Smith argued about

26 who had the right to sell drugs in the neighborhood.  Polk testified that Smith then pointed

27 the shotgun at him and followed him to his car, shooting him with shotgun pellets that Polk

28

5

United States District Court

For the Northern District of California

1    claimed "didn't hurt." Polk claimed that there were shotgun marks on his Jaguar.[3]

2         Polk testified that soon after, a mutual friend called and advised him that Smith had

3    offered to pay him $5,000 to fix his car and end the dispute.  Polk asserted that he returned

4    to the 79th Avenue neighborhood the next morning, thinking that the dispute was resolved.

5    He sold drugs for a couple hours, left, and returned again that evening to sell more drugs

6    and to talk to Smith.  He claimed he was wearing his typical dark "uniform" for selling drugs.

7         When Polk arrived at the Keys house on the evening of June 23, 2005, he testified

8    that Smith, Dajuan, and "Taco," were sitting on the front porch, and that Smith had a

9    shotgun on his lap.  He attested that when he asked Smith for the agreed-upon money,

10   Smith threatened that they were going to kill him and that he was going to be taken out in a

11   "body bag."  He stated that both Taco and Dajuan stood up, holding handguns, showing

12   support for Smith, and saying "fuck you, Nigga."  Polk testified that out of fear for his life, he

13   pulled out his gun, removed the safety, and fired at Smith.  He explained that when he

14   encountered Thompson en route to his car, he tried to calm him by telling him that he shot

15   in the air.

16        Polk explained that he did not call the police because he believed someone else

17   would, and also asserted that he did not believe he had killed Smith.

18        Polk then drove to a girlfriend's house, packed his Jaguar with clothes, and lived in

19   motels the next ten months because he feared friends would be angry at him for killing

20   Smith.  He learned from a friend that Smith had died, and that mutual friends wanted to kill

21   him.  He testified that it "never entered his mind" that police wanted to speak to him

22   regarding the shooting, and stated that he sold the gun he used to shoot Smith because he

23   needed money.

24        Polk believed that he and Smith had been manipulated by mutual friends.  He also

25   insisted on cross-examination that he had never been a pimp.

26   _____

27        [3]Police officers testified that they found no such marks on the Jaguar after they
     inspected it following Smith's murder.

28

United States District Court

For the Northern District of California

1    In its closing argument, the defense argued that Ebonique's version of the shooting

2    was more credible than Dajuan's.  It contended that Dajuan lied, and that Dajuan, Smith,

3    and Taco had weapons at the time of the shooting, and that it was therefore three (Dajuan,

4    Smith, and Taco) versus one (Polk), and that it was reasonable for Polk to shoot Smith in

5    self defense.

6    On the fifth day of deliberations, the jury advised the trial court that they agreed that

7    Polk was guilty of murder, but that they could not agree as to the degree.  In response, the

8    prosecution elected to dismiss the first degree murder charge.  That same day, the jury

9    convicted Polk of second degree murder.

10                                                **ISSUES**

11   Polk raises three claims for federal habeas relief, including:

12    (1) that his Fifth, Sixth, and Fourteenth Amendment due process, equal protection,

13   and fair trial rights were violated when the prosecution peremptorily challenged eight

14   potential jurors on the basis of their gender;

15   (2)  that his Fifth, Sixth, and Fourteenth Amendment due process, equal protection,

16   and fair trial rights were violated when the trial court failed to adequately investigate

17   reported juror misconduct; and

18   (3) that the cumulative effect of the errors violated his constitutional rights.

19                                       **STANDARD OF REVIEW**

20   A district court may not grant a petition challenging a state conviction or sentence on

21   the basis of a claim that was reviewed on the merits in state court unless the state court's

22   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

23   unreasonable application of, clearly established Federal law, as determined by the

24   Supreme Court of the United States; or (2) resulted in a decision that was based on an

25   unreasonable determination of the facts in light of the evidence presented in the State court

26   proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

27   mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

28

1   while the second prong applies to decisions based on factual determinations, *Miller–El v.*

2   *Cockrell*, 537 U.S. 322, 340 (2003).

3       A state court decision is "contrary to" Supreme Court authority, that is, falls under

4   the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

5   that reached by [the Supreme] Court on a question of law or if the state court decides a

6   case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

7   *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable

8   application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

9   correctly identifies the governing legal principle from the Supreme Court's decisions but

10  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

11  federal court on habeas review may not issue the writ "simply because that court concludes

12  in its independent judgment that the relevant state-court decision applied clearly

13  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

14  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

15      A state court's determination that a claim lacks merit precludes federal habeas relief

16  so long as "fairminded jurists could disagree" on the correctness of the state court's

17  decision. *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011) (citing *Yarborough v.*

18  *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

19  unreasonable requires considering the rule's specificity. The more general the rule, the

20  more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a

21  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

22  show that the state court's ruling on the claim being presented in federal court was so

23  lacking in justification that there was an error well understood and comprehended in

24  existing law beyond any possibility for fairminded disagreement." *Id.*

25      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

26  determination will not be overturned on factual grounds unless objectively unreasonable in

27  light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

28

United States District Court

For the Northern District of California

8

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

## DISCUSSION

## I.    Prosecution's Use of Peremptory Challenges

In his petition, Polk argues that his fair jury trial, due process, and equal protection rights were violated when the prosecution peremptorily challenged several prospective female jurors on the basis of their gender.

### A.    Legal Framework for *Batson* Challenges

The use of peremptory challenges by either the prosecution or defendant to exclude cognizable groups from a jury may violate the Equal Protection Clause.  *See Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992). The Supreme Court first held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race, *see Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and later extended this protection to challenges solely based on gender.  *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130-43 (1994); *see also United States v. DeGross*, 960 F.2d 1433, 1438-39 (9th Cir. 1992) (en banc) (same); *United States v. Omoruyi*, 7 F.3d 880, 881 (9th Cir. 1993) (peremptory challenge against unmarried female venirepersons for fear that they would be attracted to defendant violated defendant's right to equal protection as challenge was gender-based). A party may raise an equal protection claim on behalf of a juror excluded because of the juror's gender, regardless of whether the party and the excluded juror share the same gender.  *See Powers v. Ohio*, 499 U.S. 400, 406 (1991); *see also McCollum*, 505 U.S. at 56 (Equal Protection Clause applies to criminal defendant's, as well as prosecutor's, exercise of peremptory challenges).

*Batson* permits prompt rulings on objections to peremptory challenges under a three-step process.  *Id.* First, the defendant must make a prima facie case that the prosecutor exercised peremptory challenges on the basis of gender "by showing that the

9

1    totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-

2    94.  As for the second *Batson* step, if a prima facie case is made, the burden shifts to the

3    prosecutor to articulate a gender-neutral explanation for striking the jurors in question.

4    *Batson*, 476 U.S. at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).  Third and

5    finally under *Batson*, the trial court must determine whether the defendant has carried his

6    burden of proving purposeful discrimination.  476 U.S. at 98; *Wade*, 202 F.3d at 1195.

7          **B.    Background re Polk's *Batson* Claim**

8          During voir dire, the prosecutor exercised peremptory challenges against eight

9    women and four men to select the jury.  The prosecutor used his first three peremptory

10   challenges to eliminate female jurors Anne Storm, Judith Hollis, and Susan Amster.  The

11   prosecutor then used his fourth peremptory challenge against a male, and his fifth

12   challenge against a woman, Dr. Malini Singh.  The prosecutor proceeded to use his next

13   three challenges against male jurors.  The prosecutor's last four challenges were against

14   female jurors Abigail Kingkaiser, Lisa Montgomery, and Denise Gonzales from the jury

15   panel, and Betsy Tabraham as an alternate.  Ultimately, the jury selected consisted of ten

16   men and two women, and the three alternates consisted of two men and one woman.  A

17   more detailed description of the jury selection follows.

18          **1.    Trial Court Proceedings and Rulings**

19

20         Prior to jury selection and trial, the parties discussed the jury selection procedures to

21   be utilized by the court.  The court suggested that to the extent the parties wanted to bring

22   a *Batson* motion, they should advise the court that they have a motion, and the court would

23   subsequently hear arguments outside of the presence of the jury.  3 R.T. 64-65.

24         On August 13, 2007, jury selection commenced with approximately 160 prospective

25   jurors.  Jurors at Polk's trial were selected based on their answers to a thirteen-page juror

26   questionnaire followed by voir dire.  3 R.T. 50-51, 62-65, 1 SRT 10.  The voir dire

27   proceedings commenced with twelve prospective jurors who were called at random.  Both

28

     **United States District Court**
     For the Northern District of California

                                        10

the court and the parties questioned the jurors.  As noted, the prosecutor used his first three peremptory challenges to strike three of the four women in that group, including prospective jurors Storm, Hollis, and Amster.  After the prosecutor challenged Amster, defense counsel indicated to the court that she desired to make a *Batson* motion, and agreed that it could be argued later outside the presence of the prospective jurors in accordance with the procedure the court had previously discussed with the parties.  1 SRT 194-95.  Defense counsel thereafter renewed her motion after the prosecution challenged two additional jurors, including one man and then another woman, Singh, and argument was similarly deferred until later.  1 SRT 206, 221.

The prosecution then challenged three male jurors, at which point defense counsel advised the court that she was "withdraw[ing] the motion, at this time, given the last three challenges, but if the issues comes up," she was "reserv[ing her] right to bring it up again." 1 SRT 266.  The trial court subsequently clarified that the defense was withdrawing the *Batson/Wheeler* motion as follows:

Court: You had intended to make a motion to discharge this panel on the ground of so-called *Wheeler*, I know you know that.

Reporter: [Defense counsel] nods head.

Court: And *Batson*, and that is using peremptory challenges for an improper discriminatory purpose to exclude women.

Defense counsel: Yes, sir.

Court: But you have chosen not to make that motion.

Defense counsel: I have chosen not to make that motion or request any other *Batson/Wheeler* remedies, which are available under case law.

Court: Okay.  I just want it to be real clear that that's your position, so I don't have to make any decision.

1 SRT 267-68.

11

United States District Court

For the Northern District of California

1    The weekend ensued, and jury selection continued the following Monday.  After the

2    prosecution exercised its peremptory challenges to strike three additional female jurors,

3    Denise Gonzalez, Abigail Kingkaiser, and Elizabeth Montgomery, the defense notified the

4    court that it was renewing its *Batson* motion, and the court again deferred argument.  2

5    SRT 277, 284, 285.  Shortly thereafter, following selection of the jury but prior to the

6    selection of the alternates, defense counsel asked the court to approach the bench.  2 SRT

7    298.  The court inquired regarding the *Batson* motion, and defense counsel again stated

8    that it was withdrawn.  2 SRT 298.

9    Selection of the alternate jurors commenced, and the prosecution struck another

10   female juror, Betsey Tabraham.  2 SRT 308.

11   After the entire jury selection was complete, the court queried defense counsel

12   regarding the status of the *Batson* motion.  2 SRT 326.

13

14   Court: I just want the record to be very clear, I think it probably is, but let's just make
     it clearer, Ms. Beles.  At one point, when [the prosecutor] excused the juror, who
15   happened to be a woman you said that you had a motion - the same as before -
     you were renewing the motion, and I said we'll deal with it a little later.  I knew what
16   it was.  You later said the motion was withdrawn.  Did I understand correctly?

17   Defense counsel: Yes, your Honor.  At the time [the prosecutor] had –

18   Court: That's okay.

19   Defense counsel:  – kicked two women, and I'm withdrawing it at this time, because
20   I am fully aware of appellate law that indicates I must exhaust my challenges before
     *Batson/Wheeler* would stand, and I am withdrawing it at this time.
21   Court: I don't think so.

22   Defense counsel: There's law about it.  Well, I don't – I'm – that's it.  I'm done.  I'm
23   withdrawing it.

24   Court: Okay.  All right.

25   2 SRT 326-27.

26   Subsequently, the prosecutor, concerned about the record and defense counsel's

27   reasons for withdrawing the motion, interjected as follows, and as a result, defense counsel

28

12

United States District Court
For the Northern District of California

1    agreed to go forward with the motion.

2        Prosecutor: Your Honor, before we leave this issue, I just – I'm a little concerned
3        about the state of the record now, because counsel has indicated that - and if I'm
         mistaken, I'm sure counsel will correct me, but it seems as though the only reason
4        why the motion is being withdrawn is based on counsel's belief that she must fully
         exhaust all her challenges, and I don't know if – I'd prefer that if [defense counsel]
5        feels this is appropriate that she state, regardless of whether or not that is the law,
         that she is withdrawing those challenges.

6        Defense counsel: Okay.  Well, then, fine.  I'll just make the motion.
7
8        Court: Okay.

9        Defense counsel: Fine, if we want to do it this way, fine. [Prosecutor], last week, the
         first peremptory was - may I say the names.
10
11       Court: Let's start over.  What you're doing is, you're asking that the jury panel be
         discharged and that, conveniently, we have not sworn the jury, so jeopardy hasn't
12       attached, so we're kind of in the clear on this any way you look at it.  You're making
         a motion to dismiss this panel all together, and it's your assertion that [the
13       prosecutor] has been systematically excluding a particular class of jurors, that is,
         women.
14
15       Defense counsel: That is true, your Honor.

16       Court: I'm familiar with who's been excused, and the record is pretty clear on that.
         And my notes show that the order in which the people [the prosecutor] excused
17       were of the following gender, and I'm going in the order of people excused: woman,
         woman, woman, man, woman, man, man, man, woman, woman, woman.
18
         Defense counsel: Accurate.
19
20       Court: And then a woman alternate.

21       Defense counsel: Accurate.
22
         Court: Okay.
23
         Defense counsel: So moved.
24
     2 SRT 327-29.
25
26       The trial court then found that Polk had not made a prima facie case for systematic

27   exclusion of females from the jury.  2 SRT 329.  It noted that there were two women on the

28   jury, along with an additional female alternate juror.  The court found specifically as follows:

13

1  |  Two on the jury, one alternate.  Let's face it.  Interestingly enough, in this
2  |  particular type of motion we're dealing with a situation where it's an inherent 50/50.  It's pretty much an even split, generally, between men and women.
3  |  And the simple fact that the numbers aren't exactly 50/50, I don't think constitutes a prima facie showing that there's been a discriminatory practice
   |  here in the use of peremptory challenges.  While there are more women
4  |  excused than men, [the prosecutor] has excused a number of men as well, and there are women on the jury, although there is certainly a distinct majority
5  |  of men.  But I don't find that there's been a prima facie showing, so I don't
   |  feel that there's any reason to call upon [the prosecutor] to explain his use of
6  |  peremptories, but I'll give you the opportunity if you want it.

7  2 SRT 329.

8

9       The prosecutor subsequently elected to put his reasons on the record for exercising

10  his peremptory challenges as to the challenged jurors.  Before doing so, though, he

11  clarified the specific jurors for whom the defense was making the *Batson* motion as follows:

12  |  Prosecutor: Two things, Judge.  First I would like to make sure that I have the
   |  correct jurors for which [defense counsel] is making this motion.  I have indicated
13  |  Ms. Amster and Ms. Singh from yesterday.

14  |  Court: You mean Thursday.

15  |  Prosecutor: I'm sorry?

16
   |  Court: Thursday.
17
   |  Prosecutor: Yes, Yes, I'm sorry.
18

19  |  Court: Our last court date.

20  |  Prosecutor: Thursday, Your Honor.  And today the motion was made after I
   |  excused, I believe, two other jurors.
21

22  |  Defense counsel: Kingkaiser and then Montgomery.

23  |  Prosecutor: And Ms. Montgomery, and so there are four jurors at issue, if you will.
   |  And for the first two, Your Honor, my questionnaires are up in my office, and I would
24  |  like to review those before I state my reasons as to why.  I can do it all together – all
   |  four jurors together, or I could just handle Ms. Kingkaiser and Ms. Montgomery, and
25  |  we can handle the other two at a later time.  But before I address jurors Amster and
   |  Singh, I would need to get those questionnaires.
26

27  2 SRT 329-30.

28

                                          14

United States District Court

For the Northern District of California

1    The court then recessed for the prosecutor to obtain and review the questionnaires.

2  Following the recess, the court asked defense counsel for argument on the *Batson/Wheeler*

3  motion, to which defense counsel responded as follows.

4       Defense counsel: Your Honor, upon further reflection, I had said something prior to
       the break regarding exhaustion of peremptory challenges.  I do not stand by that
5       argument, but I did make my *Wheeler/Batson* motion, and I do not stand by that as
       a basis of law, so I should stand by my motion.  The court has ruled there's no prima
6       facie case, and whatever the prosecution wants to do at this point is neither here nor
       there for me.
7

8       Court: [Prosecutor], did I understand correctly that even though you don't have to,
       I'm not requiring you to, you want to make a record on the use of those
9       peremptories?

10      Prosecutor: If I may, Your Honor.

11      Court: Sure, go ahead.

12  2 SRT 331.

13

14    At that point, the prosecutor explained his reasons for striking jurors Amster, Singh,

15  Kingkaiser, and Montgomery, which are discussed in detail below.  2 SRT 331-35.  The trial

16  court did not comment on the explanations given by the prosecution presumably because

17  the court had already found that the defense's *Batson* motion did not set forth a prima facie

18  case of gender bias.

19                    **2.      State Appellate Court Proceedings and Decision**

20    Polk appealed the trial court's ruling on his *Batson* motion to the state appellate

21  courts.  In his opening brief before the California Court of Appeal, Polk noted that during

22  voir dire, the defense "made a *Wheeler/Batson* motion *focused on four female jurors*,"

23  including Amster, Singh, Kingkaiser, and Montgomery.  Exh. 3 at 55 (emphasis added).

24  Polk argued that the trial court erred in concluding that he failed to set forth a prima facie

25  case of group bias on the basis of gender.  He contended that the fact that such a large

26  percentage of the prosecutor's peremptory challenges were against women tended to show

27  group bias or intentional gender stereotyping.  Polk also asserted that the California Court

28

15

of Appeal should utilize comparative juror analysis since the prosecutor articulated reasons for his challenges.  Exh. 3 at 59 n. 17.  Polk contended that the prosecutor's proffered reasons suggested pretext.

The California Court of Appeal upheld the trial court's determination that Polk failed to establish a prima facie case for group bias on the basis of gender.  At the outset, the court noted that:

> while defense counsel did ask the court to determine whether the prosecutor was exercising his peremptory challenges in a discriminatory fashion, the motion was half-hearted at best. Defense counsel withdrew her motion no less than three times, and she only made it when the court asked her yet again whether she wanted to pursue it. Defense counsel's reluctance is telling.

The appellate court further found that because the prosecutor exercised several peremptory challenges against men - in addition to the ones he exercised against women - "[t]here was no blanket policy of exclusion of women."  The court reasoned that the type of gender discrimination alleged by Polk was problematic because "[s]ince all jurors are either men or women, an attorney's peremptory challenges inevitably will apply to at least half of one gender or the other.  Given this situation, it is reasonable to accept a relatively higher percentage of challenges to a given gender without giving rise to an inference of discrimination."  Additionally, the court concluded that the fact that the prosecutor utilized eight out of twelve of his peremptory challenges against women did not establish a prima facie case of discrimination.  It noted that the California Supreme Court had held that such numerical disparities were insufficient.

Finally, the court declined to employ comparative juror analysis since the trial court ruled that Polk failed to make out a prima facie case based on *Batson's* first step.  In support, it relied on cases from the California Supreme Court suggesting that although such analysis was appropriate at the third step of the analysis, it had "little or no use" at the first stage.

Polk subsequently petitioned for review before the California Supreme Court, again

16

United States District Court

For the Northern District of California

1   arguing that "an inference of group bias was made here *as to all four women*, especially

2   given the conspicuous percentage of peremptory challenges against women (eight of

3   twelve) and the conspicuous lack of women on the jury (three of fifteen)."  Exh. 5 at 12.

4   Citing to the United States Supreme Court's decision in *Miller-El v. Dretke* ("*Miller-El II*"),

5   545 U.S. 231, 240-45 (2005), Polk further argued that the California Court of Appeal erred

6   when it refused to employ comparative juror analysis at stage one given that the prosecutor

7   had provided reasons for his challenges.  As noted above, the California Supreme Court

8   summarily denied review.

9        **C.   Polk's Federal Habeas Petition**

10

11          **1.   Enlargement/Expansion of Scope of Claim**

12        At the outset, the court notes that Polk attempts to enlarge the scope of his *Batson*

13   claim before this court.  Before the trial court and the state appellate courts, Polk's

14   *Wheeler/Batson* motion clearly concerned four prospective jurors - Amster, Singh,

15   Kingkaiser, and Montgomery.  Given defense counsel's confusion and indecisiveness

16   regarding the *Batson* motion, the prosecutor clarified on the record that this was the case

17   prior to offering explanations regarding his peremptory challenges, and defense counsel

18   agreed and never suggested that the *Batson* motion focused on other prospective jurors.

19   Additionally, as noted above, in his appellate briefs before the California Court of Appeal

20   and the California Supreme Court, Polk explicitly recognized that his *Batson* motion

21   focused on the above four jurors.

22        Now, for the first time in his federal habeas petition, Polk suggests that the

23   prosecutor "inferred (incorrectly)" that only those four prospective jurors were at issue.

24   Petition at 17.  He further notes that the prosecutor did not offer any explanation for his

25   decisions to eliminate jurors Storm, Hollis, Gonzalez, or Tabraham, and suggests that the

26   state courts erred in failing to ascertain whether there was a gender-neutral basis in the

27   record for the elimination of those prospective jurors and for failing to "review the

28

United States District Court

For the Northern District of California

1    circumstances surrounding the challenges."  Petition at 19.  However, that was clearly

2    because the defense did not assert that its *Batson* motion was based on the challenges to

3    those jurors.  Moreover, the state trial and appellate courts did not review the prosecutor's

4    explanations regarding *any* of the jurors since the state courts determined that Polk failed

5    to set forth a prima facie case at step one.

6         The court has addressed the attempted enlargement in greater detail below in its

7    discussion of the role of comparative juror analysis in this case.

### 2.    Necessity/Role of Comparative Jury Analysis

9         In this case, the California Court of Appeal specifically declined to conduct a

10   comparative analysis of jurors, concluding that such analysis was not required at step one

11   of the *Batson* test.  Polk argues that the appellate court's reasons for concluding that a

12   prima facie case had not been made were unreasonable, and that comparative jury

13   analysis was required given the fact that the prosecutor in this case articulated reasons for

14   the challenges.

16        The state spends the majority of its opposition brief arguing that the state courts

17   were not required to conduct a comparative juror analysis, and neither is this court.  It

18   argues that the state court's conclusion that Polk failed to make out a prima facie case was

19   reasonable, and that the state appellate court's decision not to utilize comparative juror

20   analysis was not unreasonable.  It notes that under state law, comparative juror analysis is

21   only appropriate at the third stage - and not the first stage.  It also argues that even though

22   the Ninth Circuit has held that comparative juror analysis is required in a step one inquiry,

23   there is no United States Supreme Court law requiring comparative juror analysis at that

24   stage.

25        In *Boyd v. Newland*, the Ninth Circuit held that "under the clearly established

26   Supreme Court precedent of *Batson*, comparative juror analysis is an important tool that

27   courts should utilize on appeal when assessing a defendant's plausible *Batson* claim."  467

28

United States District Court

For the Northern District of California

1   F.3d 1139, 1150 (9th Cir. 2006).  In reaching this decision, the court in *Boyd* suggested that

2   a comparative juror analysis should be undertaken even in circumstances where the trial

3   court ruled that the defendant failed to make a prima facie showing at the first step of the

4   *Batson* analysis.  *Id.* at 1148-49 (holding that because comparative juror analysis assists a

5   court in determining whether the totality of the circumstances gives rise to an inference of

6   discrimination, this analysis is called for on appeal even when the trial court ruled that the

7   defendant failed to make a prima facie showing at the first step of the *Batson* analysis); *see*

8   *also Crittenden v. Ayers*, 624 F.3d 943, 956 (9th Cir. 2010) (employing a comparative juror

9   analysis for the first time in federal habeas proceedings to find that the defendant made a

10  prima facie showing).  The *Boyd* court's decision was based on the United States Supreme

11  Court's decision in *Miller El II*,  545 U.S. at 240-45.  *See Boyd*, 467 F.3d at 1150, 1151

12  (noting that *"Miller-El II* makes comparative juror analysis a centerpiece of the *Batson*

13  analysis").

14          Contrary to the state's arguments otherwise, it is apparent to this court that the Ninth

15  Circuit's interpretation of *Miller-El II* (which this court is required to follow) mandates

16  comparative juror analysis in this case, and also that this court conclude that the state

17  court's failure to conduct its own comparative analysis of seated jurors with excused jurors

18  in conducting its analysis of petitioner's *Batson* claim was contrary to federal law.  *See*

19  *Boyd*, 467 F.3d at 1149; *Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006). The state

20  court's unreasonable application of clearly established United States Supreme Court

21  precedent in failing to conduct a comparative analysis of the seated jurors with the excused

22  jurors requires this court to examine Polk's *Batson* claim *de novo*.  *See Panetti v.*

23  *Quarterman*, 551 U.S. 930, 953-54 (2007) (when a state court's adjudication of a claim "is

24  dependent on an antecedent unreasonable application of federal law," a federal court must

25  "resolve the claim without the deference AEDPA otherwise requires"); *see also Johnson v.*

26  *Finn,* 665 F.3d 1063, 1068-69 (9th Cir. 2011) (where the state court uses the wrong

27  standard for reviewing a *Batson* claim, the state court's findings are not entitled to

28

deference and the federal court reviews the claim *de novo*).

Following the Supreme Court's decision in *Miller-El II,* the Ninth Circuit has reiterated in numerous cases that where the state courts have failed to engage in a comparative juror analysis, this court must undertake such analysis *de novo* rather than remand the case to the state courts to do so. *Green v. Lamarque*, 532 F.3d 1028, 1030-31 (9th Cir. 2008) (citing *Miller-El II*, 545 U.S. at 241; *Kesser*, 465 F.3d. at 356-58, 360). Additionally, the Ninth Circuit has held that where the state court record does not provide an adequate basis for the federal habeas court to determine the prosecutor's reasons for striking the jurors, an evidentiary hearing is required. *See Love v. Scribner*, 278 Fed. Appx. 714, 718 (9th Cir. 2008); *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004).

Here, Polk concedes that an evidentiary hearing is not required for this court's comparative juror analysis because the record contains the prosecutor's articulated reasons for challenging prospective jurors Amster, Singh, Kingkaiser, and Montgomery. However, as noted above, he simultaneously complains for the first time in these federal habeas proceedings that the state court should have required the prosecution to provide explanations for its challenges to Storm, Hollis, Gonzales, and Betsy Tabraham as well. Polk does *not* suggest that an evidentiary hearing is required, though, based on the absence of reasons in the record regarding those challenges. Nevertheless, given the Ninth Circuit's holdings regarding this court's duty to develop the record where the prosecution's reasons are absent, the court is required to address the issue.

The court finds that had Polk's *Batson* motion challenged the prosecution's striking of  Storm, Hollis, Gonzales, and Tabraham, then the Ninth Circuit's decisions in *Paulino* and *Love* may have required that this court conduct an evidentiary hearing to develop the silent record regarding the prosecution's reasons for striking those jurors. *See Love*, 278 Fed. Appx. 718; *Paulino*, 371 F.3d at 1092. However, as discussed above, Polk did not challenge the striking of those jurors in state court - at the trial level or at the appellate level. Instead, his *Batson* claim focused on jurors Amster, Singh, Kingkaiser, and

1   Montgomery.  Polk is not permitted to enlarge the scope of his *Batson* claim beyond that

2   which he raised before the state courts because to do so would render the claim

3   unexhausted.   Accordingly, in conducting its own comparative juror analysis, the court is

4   required to focus on the prosecution's reasons for striking Jurors Amster, Singh,

5   Kingkaiser, and Montgomery, and as Polk concedes, the record is complete regarding the

6   prosecutor's reasons for striking those jurors.

7        Moreover, the court notes that because the record includes the prosecutor's

8   explanations for his peremptory challenges to Jurors Amster, Singh, Kingkaiser, and

9   Montgomery, the United States Supreme Court has held that the preliminary issue

10  regarding whether Polk has made a prima facie showing becomes moot on federal habeas

11  review, and that this court is required to proceed directly to the second and third steps of

12  the *Batson* analysis.  *See Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Stubbs v.*

13  *Gomez*, 189 F.3d 1099, 1104 (9th Cir. 1999).  In other words, in analyzing Polk's *Batson*

14  claim, the court presumes that Polk is able to satisfy step one of the *Batson* test, which

15  requires a prima facie showing, and proceeds directly to steps two and three.

16      **3.    Analysis**

17
18      **a.    Prosecutor's Explanations**: **Step Two**

19      *Prospective Juror Susan Amster*

20      The prosecutor gave three reasons for challenging prospective juror Susan Amster.

21  2 SRT 331-333.  First, he noted that Ms. Amster worked for an organization that assisted

22  elderly and disabled individuals and that she had studied sociology with the "option" of

23  becoming a social worker.  He explained that, in his experience, individuals with sociology

24  backgrounds are not "pro prosecution jurors."  *Id.* at 332.  Second, the prosecutor was

25  concerned because Amster had indicated on her jury questionnaire that "someone [she]

26  knew shot someone who was injured by a firearm," but then when he questioned her about

27  the statement, Amster appeared to have no idea what he was referring to and "an odd

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  dialogue" followed, which concerned him.  Third, the prosecutor was concerned by

2  Amster's response on her questionnaire that she was "quite frightened by murder" and that

3  she was not sure whether this fear would make her a biased juror.  *Id.*

4  *Prospective Juror Malini Singh*

5  The prosecutor similarly detailed three reasons for challenging juror Malini Singh.  2

6  SRT 333.  He asserted that he dismissed Singh because: (1) her sister worked in a public

7  defender's office; (2) Singh was a doctor, and  "they don't get along with the other jurors,"

8  and sometimes they tend to second guess any medical experts that are called as

9  witnesses; and (3) Dr. Singh had once been held in police custody for an incident.[4]

10  *Prospective Juror Abigail Kingkaiser*

11

12  The prosecutor also detailed several reasons for challenging juror Abigail

13  Kingkaiser.  2 SRT 333-34.  Those reasons included the fact that the prosecutor was

14  concerned with her profession as a teacher.  The prosecutor stated, "Like doctors, I'm not

15  big on teachers as jurors, if I can help it."  *Id.*

16  Additionally, the prosecutor was concerned by Ms. Kingkaiser's pursuit of a masters

17  degree in divinity and her membership in Amnesty International.  The prosecutor explained

18  "that in this case, [Ms. Kingkaiser] may identify or sympathize with the defense, given her

19  membership with that organization," and therefore would not be a fit juror.  *Id.*

20  *Prospective Juror Lisa Montgomery*

21

22  The prosecutor gave two reasons for challenging juror Lisa Montgomery.  2 SRT

23  334-35.  First, it was his understanding that she was involved in child support litigation with

24  his office's Family Support Division, and that as a result she would not be in favor of the

25  prosecution.  Second, he noted that Montgomery indicated that her son had been involved

26  _____

27  [4]During voir dire, Ms. Singh explained that she had been detained on charges for failing
to pay a livery – a limo service – and after thirteen hours she was released and the charges

28  were dropped.

United States District Court

For the Northern District of California

1    in criminal activity, had gone to trial, and that she believed that he was not fairly treated by

2    the police.  *Id.*[5]

3        Following the prosecutor's proffer as to the four prospective jurors, the court gave

4    defense counsel an opportunity to respond.  2 SRT 335.  Defense counsel offered only one

5    response to the prosecutor's explanations, which concerned only one of the four

6    challenged jurors, Amster.  She noted for the record that Amster had indicated several

7    times that she was very, very nervous.  *Id.*

8        At step two of the *Batson* analysis, the prosecutor must give a clear and reasonably

9    specific explanation of his legitimate reasons for exercising a challenge — reasons that

10   must be related to the particular case being tried.  *Purkett v. Elem*, 514 U.S. 765, 768–69

11   (1995).  A "legitimate reason" need not be a reason that makes sense, is persuasive, or is

12   even plausible.  *Id.*  It must, however, be a reason that does not deny equal protection.  *Id.*

13   at 769. The issue is the facial validity of the explanation.  *Id.* at 768.  At this second step,

14   the reason offered will be deemed race or gender neutral "[u]nless a discriminatory intent is

15   inherent in the prosecutor's explanation."  *Id.*; *see also Rice v. Collins*, 546 U.S. 333, 338,

16   (2006) (so long as reason offered is not inherently discriminatory, it suffices at step two of

17   the analysis).  Any determination about the credibility of the explanation is reserved for the

18   third step of the analysis.  *Purkett*, 514 U.S. at 768.  Steps two and three are independent

19   inquiries that may not be collapsed into one.  *Id.*

20       Based on the record, the court finds that the prosecutor's reasons for striking Jurors

21   Amster, Singh, Kingkaiser, and Montgomery are gender-neutral, such that they satisfy

22   *Batson*'s step two.  *See generally Purkett*, 514 U.S. at 769; *Rice*, 546 U.S. at 339; *see also*

23

24   _____

25       [5]During voir dire, the prosecutor asked Montgomery, "Was [your son] ever treated
     unfairly by the police as far as you know?"  Montgomery replied, "Yes–I can't say that, because
26   I wasn't there, but. . . ," after speaking with her son about the incident, her opinion was that he
     had been treated unfairly.

27       Ms. Montgomery also stated that, "Well, truthfully, my son deserves what he got."

28

United States District Court
For the Northern District of California

*United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) (juror profession and the juror having a poor attitude are race-neutral reasons for exercising peremptory challenges); *Stubbs*, 189 F.3d at 1105 (juror's demeanor and lack of eye contact showing disinterest in being a juror is a valid, race-neutral reason for exercising a peremptory challenge). The prosecution's reasons for striking Jurors Amster, Singh, Kingkaiser, and Montgomery as articulated carry no apparent inherent discriminatory intent and are related to the particular case to be tried.  Nevertheless, the court is required to proceed to step three.  *See Paulino*, 542 F.3d at 702; *Green*, 532 F.3d at 1030.

### b.    Step Three:  Comparative Juror Analysis

Polk argues that the results of comparative juror analysis demonstrate that the prosecution's justifications were pretextual and constituted purposeful discrimination on the basis of gender.  The court has addressed below Polk's specific arguments regarding each of the challenged jurors. Because it contends that comparative juror analysis is not required, the state has not addressed any of Polk's specific comparative juror analysis arguments.[6]

### i.    Legal Standards

Under the third *Batson* step, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  476 U.S. at 98; *Wade*, 202 F.3d at 1195.  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools, including its own observations and the assistance of counsel.  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).

In evaluating the race or gender neutrality of the explanation, the court must keep in

[6]The state also argues that Polk failed to exhaust his arguments regarding comparative juror analysis before the state courts.  However, having reviewed Polk's briefs before the California Court of Appeal and his petition for review before the California Supreme Court, the court finds this argument to be without merit as Polk clearly asserted before the state appellate courts that comparative juror analysis was warranted.

24

United States District Court

For the Northern District of California

1    mind that proof of discriminatory intent or purpose is required to show a violation of the

2    Equal Protection Clause.  *See Hernandez*, 500 U.S. at 355-62 (no discriminatory intent

3    where Latino jurors dismissed because of possible difficulty in accepting translator's

4    rendition of Spanish language testimony).  It should also keep in mind that a finding of

5    discriminatory intent turns largely on the trial court's evaluation of the prosecutor's

6    credibility as well as the "juror's demeanor."  *See Snyder v. Louisiana*, 552 U.S. 472, 477

7    (2008); *Rice*, 546 U.S. at 340-41; *Lewis*, 321 F.3d at 830.

8         In conducting the comparative juror analysis, the correct comparison is between the

9    struck juror and similarly-situated jurors who were "allowed to serve."  *Miller–El II*, 545 U.S.

10   at 241; *see also Boyd*, 467 F.3d at 1147–48 (a court must "compare the prospective juror

11   who was stricken with the other prospective jurors who were not").  The analysis requires a

12   "sensitive inquiry into such circumstantial and direct evidence of intent as may be

13   available." *Green*, 532 F.3d at 1030 (quoting *Batson*, 476 U.S. at 93).  The Ninth Circuit

14   has held that the "circumstantial and direct evidence" needed for this inquiry includes a

15   comparative analysis of the jury voir dire and the jury questionnaires of all venire members,

16   not just those venire members stricken.  *See id; see also Williams v. Pliler*, 411 Fed. Appx.

17   954 (9th Cir. 2011).

18        If a prosecutor's proffered reason for striking a female jurist applies equally to an

19   otherwise similar male who is permitted to serve, "that is evidence tending to prove

20   purposeful discrimination."  *Miller-El II*, 545 U.S. at 241; *see also Kesser*, 465 F.3d at 360.

21                        ii.    **Analysis**

22

23        In conjunction with its comparative juror analysis, the court has reviewed the voir

24   dire transcripts and the jury questionnaires in their entirety.

25                              ***Amster***

26        Polk notes that the prosecution struck Amster based in part on her fear of murder,

27   and suggests that this can't possibly be the prosecution's reason because her fear of

28

1    murder would have biased her in favor of the prosecution.

2        Page twelve of the juror questionnaire asked prospective jurors whether "there [is]

3    any matter that *has not* been covered by this questionnaire that you feel you should

4    mention, since it might affect your ability to be a fair and impartial juror in this case?"

5    Amster replied, "I am quite frightened by murder.  My first thought was how could this

6    person *kill* another human life.  I am not sure if this will bias me or not."  As noted, the

7    prosecutor explained that this response caused him concern because he felt that Ms.

8    Amster would not be able to handle the testimony and evidence presented at trial, "much

9    less convicting someone," of murder.

10       It is true that the Ninth Circuit has found that an explanation is unpersuasive if the

11   potential juror's statement would logically suggest bias in favor of the prosecution.  *See Ali*

12   *v. Hickman*, 584 F.3d 1174, 1184 (9th Cir. 2009).  It is not clear that is the case here,

13   though.  Instead, it appears that the prosecution was concerned regarding Amster's ability

14   to sit through an entire murder trial based on the fear that she volunteered on her

15   questionnaire.

16       However, even if the court could find that Amster's statement indicated a pro-

17   prosecution bias, the statement was just one of the prosecution's reasons for striking

18   Amster.  The prosecution also proffered that in his experience, individuals with sociology

19   backgrounds are not "pro-prosecution jurors."  None of the other seated jurors had

20   sociology backgrounds.  Additionally, a review of the voir dire transcripts and Amster's jury

21   questionnaire reveals that she did in fact engage in an odd dialogue with the prosecutor

22   after he questioned her regarding another statement on her questionnaire that she knew

23   someone who shot someone else.  Amster initially did not seem to recall the response, and

24   even admitted that she was "blanking out."  Furthermore, during voir dire, Amster conceded

25   that she had trouble working with other people, although she asserted she was getting

26   better at it.

27

28

United States District Court

For the Northern District of California

Given the record, the court does not find evidence of purposeful discrimination in the prosecutor's striking of potential juror Amster.

### *Kingkaiser*

Polk challenges all of the explanations the prosecutor provided regarding striking potential juror Kingkaiser.  First, he notes that the prosecutor stated that he struck Kingkaiser in part because she was a teacher, but did not pose the same challenge to juror no. 9, who had been working as a teacher for several years.  Second, Polk notes that the prosecution struck Kingkaiser in part because she was a member of Amnesty International, but did not challenge another prospective juror, David Hodgkins, because he was a member of the American Civil Liberties Union ("ACLU").  *See* SRT 227.  Third, Polk notes that the prosecutor stated that he was challenging Kingkaiser in part based upon her studies in divinity, which Polk presumes was because the prosecutor believed that a deep commitment to religion would impair her ability to function.  He notes that several other jurors indicated that they were actively involved in their own religious practices, including jurors nos. 4, 9, and 11.  *See* SRT 44, 109, 135.

Polk is correct that the prosecutor did not strike another potential juror, juror no. 9, who was also a teacher, in spite of his assertion that he was "not big on teachers."  *See* SRT 254.  Moreover, it does not appear that Kingkaiser was a teacher per se.  She was actually working as an SAT tutor, which the prosecution seems to have equated with "teaching."  Accordingly, the prosecutor's explanation that he struck Kingkaiser because she was a teacher is not particularly persuasive.

However, again, this was not the only reason that the prosecutor offered for striking Kingkaiser.  The prosecutor further explained that he ultimately felt like Kingkaiser was "something less than a pro prosecution juror" and that she might "identify or sympathize with the defense."  SRT 334.  He noted her prior membership in Amnesty International and her pursuit of a degree in divinity studies in support.  *Id.*  Polk's reference to another

1    prospective juror, Hodgkins, who was a member of the ACLU does not undermine the

2    prosecutor's mention of Kingkaiser's membership in Amnesty International because

3    Hodgkins, like Kingkaiser, was not seated on the jury.  The law is clear that in conducting

4    comparative juror analysis, this court is required to compare Kingkaiser to other *seated*

5    jurors - not to other prospective jurors.  *Miller–El II*, 545 U.S. at 241; *see also Boyd*, 467

6    F.3d at 1147–48 (a court must "compare the prospective juror who was stricken with the

7    other prospective jurors who were not").  Here, contrary to Polk's assertion otherwise, the

8    court cannot know that the prosecutor did *not* strike Hodgkins based entirely or in part on

9    his ACLU membership because the prosecutor was never called upon to provide his

10   reasons for striking Hodgkins, and Polk, understandably, did not challenge the striking of

11   Hodgkins, a man, in the context of his *Batson* motion.

12          Additionally, the court cannot agree that the pursuit of divinity studies can be

13   equated with church involvement and religious activity in general as Polk propounds, such

14   that Kingkaiser's divinity studies made her similarly situated to other jurors who were active

15   with their church or other religious congregations.  Rather than focusing on religion per se,

16   the prosecution appeared to look collectively at Kingkaiser's activities that may have

17   suggested she was sympathetic to the defense.  The court notes that Kingkaiser further

18   admitted during voir dire that her father was an attorney who handled juvenile criminal

19   cases.

20          In sum, the court similarly fails to find evidence of purposeful discrimination in the

21   prosecutor's striking of potential juror Kingkaiser.

22                                    ***Montgomery***

23

24          Polk's challenge to the prosecution's striking of juror Montgomery is the weakest of

25   all of his challenges.  He notes that the prosecutor relied in part on Montgomery's

26   statements regarding her son's involvement with the criminal justice system, but asserts

27   that he misconstrued her statements because although Montgomery stated that she felt her

28

son was treated unfairly by the police, she later added that he got what he deserved. According to Polk, as a result, this could not have been his actual reason for striking Montgomery.

The prosecutor's characterization of Montgomery's statement was not inaccurate.  It is true that although Montgomery stated that she believed her son had been unfairly treated by the police, that he was nevertheless treated fairly in court and that he "deserved what he got."  The prosecutor was not required to discount Montgomery's initial statement regarding her opinion of the unfair treatment by police.  Moreover, the primary reason provided by the prosecutor for striking Montgomery, and a reason that strongly suggests Montgomery may have been biased against the prosecution, was the fact that Montgomery herself was simultaneously being prosecuted by the prosecutor's same office - the Alameda County District Attorney - for an alleged failure to pay child support.

Again, the court fails to find evidence of purposeful discrimination in the prosecutor's striking of potential juror Montgomery.

### Singh

Finally, Polk challenges the prosecution's explanation that Singh had been held in police custody in New York City once for failure to pay a limo service.  Polk correctly notes that a number of other male jurors had similar, and arguably more serious, "incidents" than that cited by the prosecution with respect to Singh, including a DUI conviction (juror no. 3 and 15), a DUI charge and trespassing conviction (juror no. 12), and an arrest for having a prohibited weapon in a vehicle (juror no. 9).  Accordingly, this explanation may suggest pretext.

Additionally, Polk compares the fact that Singh's sister was a public defender with the fact that juror no. 12 had a friend who practiced criminal defense.  The court, however, finds that Singh and juror no. 12 are not similarly situated in this respect.  Singh admitted that she talked with her sister about her job and "hears her sister's stories," but seemed to

29

United States District Court

For the Northern District of California

suggest that her sister did not disclose anything that she wasn't ethically permitted to disclose. *See* SRT 204 (noting that "we don't talk [at] a professional level about her opinions or her thoughts about her clients"). By contrast, juror no. 12 stated that he had a friend whom he was "not in contact with . . . all that often lately," who practices criminal law, from whom he had heard "little stories here and there, but not much." SRT 290. Contrary to juror no. 12, Singh's connection was a close family member - her sister - with whom she was in regular contact. Moreover, her sister was a public defender. Unlike Singh, juror no. 12 did not appear to be close to the friend, nor is it clear whether his friend was a criminal defense attorney or a prosecutor. It was both fair and reasonable for the prosecution to presume a greater potential bias on Singh's part based on her sister's job and her relationship with her sister.

Moreover, in addition to Singh's sister's job and the livery incident, the prosecutor also relied on the fact that Singh was a doctor who may not get along well with the other jurors and who may second guess any medical experts or witnesses. Singh asserted during voir dire that she had been working as an emergency medicine physician for nine years, and that she had previously testified as an expert herself at a trial concerning a person's injuries sustained in a house fire. SRT 203, 205. None of the other seated jurors were physicians, and none appeared to have testified previously as experts. The prosecutor's reason, therefore, appears reasonable given the circumstances of the case.

In sum, two of the three reasons provided by the prosecutor appear to be valid and non-pretextual. On balance, the court fails to find evidence of purposeful discrimination in the prosecutor's striking of potential juror Singh.

In conclusion, having reviewed the record *de novo* and having conducted a comparative juror analysis, the court finds that this case is unlike *Ali*, the Ninth Circuit case on which Polk heavily relies, and concludes that the analysis at steps two and three of the *Batson* test preclude relief on Polk's claim. *See* 584 F.3d at 1176. In *Ali,* the Ninth Circuit held that the prosecutor's proffered race-neutral reason for peremptorily striking an African

30

American juror in a first-degree murder prosecution, specifically her indication that anything less than professional and respectful conduct on part of attorneys might affect her view of the case, was pretext for purposeful discrimination in violation of Equal Protection Clause. *Id.* In support, the Ninth Circuit, held that the potential juror merely expressed reasonable expectations concerning attorney behavior, and that the prosecutor did not peremptorily strike other potential juror who raised similar expectations. *See id.* The Ninth Circuit further found that the prosecutor's assertion that he struck the potential juror because she hesitated about the affect of her daughter's molestation was unpersuasive because, "any bias on [the potential juror's] part would logically favor the prosecution, not the defense." *Id.* at 1184.

Here, unlike *Ali*, the court finds that the prosecutor's stated reasons, with the two possible exceptions indicated above,  were consistent with and logically based upon the prospective jurors' remarks in their jury questionnaires and during voir dire.  Moreover, this court's comparative juror analysis reveals that the vast majority of reasons provided by the prosecutor for his striking the four challenged female jurors do not suggest pretext.

For these reasons, Polk is not entitled to habeas relief on his *Batson* claim.

**II.     Juror Misconduct Claim**

Polk also contends that his due process, equal protection, and fair trial rights were violated when the trial court failed to adequately investigate juror misconduct.

**A.     Background**

At trial, one of the prosecution's theories was that Polk was a pimp and that the shooting was triggered by an argument regarding Polk's pimping activities.  In accordance with this theory, over Polk's objection, the trial court admitted several photographs from Polk's thirtieth birthday party.  Two of the photographs showed Polk with an older, stylishly

United States District Court

For the Northern District of California

dressed man, one of which featured Polk and the man sitting in the back of a limousine.[7]
It turned out that the older man was a pimp named "Fillmore Slim, who apparently had
been the subject of a documentary movie called "American Pimp."

Following the close of the prosecution's case, the trial court announced that it had
received a note from alternate juror no. 14.  The court dismissed the rest of the jurors and
asked juror no. 14 to remain behind.  The court read aloud juror no. 14's note to the parties,
which stated as follows:

> I may have seen the older gentleman pictured with the defendant in the limo
> and at the party. I saw him in a documentary on HBO approximately two
> years ago. I'm not sure it's important, but thought it should be known. The
> documentary was entitled 'American Pimp.'The person's name on the film
> was Fillmore Slim.

R.T. 1891.

The court then queried the juror regarding whether he had shared the information
with any of the other jurors.  The juror responded that he "talked to juror no. 1 about
possibly knowing someone that was on a documentary."  He stated that he "didn't go into
detail about it," but asked the other juror whether he thought he should bring the issue up.
R.T. 1891-92.  He stated that he had not mentioned the name "Fillmore Slim" to the other
juror, nor had he disclosed the information to anyone else on the jury.  R.T. 1892-93.

The court then queried juror no. 14 regarding whether his knowledge of Fillmore
Slim would affect his view of the case, to which the juror repeated at least six times that it
would not.  *Id.*  The juror again reiterated that he raised the issue because he believed "the
court should be aware of it."  R.T. 1893.

Defense counsel then asked the court to inquire of the juror whether he mentioned
the name of the documentary or the word "pimp" to juror no. 1.  R.T. 1894-95.  The juror
responded

---

[7]Other photographs showed Polk with attractive scantily-clad women, and one
photograph showed Polk's birthday cake, on which the words "pimpin 4 life" were written.

I don't recall.  I think I just said I saw him in a documentary.  I don't recall.  It was just kind of brief.  Yeah, I don't recall if I did.  I don't think I did.

R.T. 1895.  The court then asked juror no. 14 if he told juror no. 1 which man in the photograph he was talking about.  Juror no. 14 replied

No, I didn't even mention the guy.  I just said a person in one of the photographs, I think I may have remembered him from a documentary, do you think I should bring that up, basically, because I didn't know if I should bring it up or not, because he wasn't a witness or related to the case really.  He was just in a picture.

R.T. 1895.

The trial court subsequently admonished the juror not to discuss the case with any of the other jurors, to which juror no. 14 agreed.  R.T. 1895.  Juror no. 14 also clarified at that point that the juror with whom he had spoken was actually juror no. 7 and *not* juror no. 1. R.T. 1896.  The court dismissed juror no. 14 for the weekend, and then solicited comments from counsel.

Defense counsel moved to dismiss juror no. 14 on the basis that it would be impossible for the juror to ignore Fillmore Slim's notoriety in evaluating the evidence against Polk.  R.T. 1897.  The court denied the request, ruling that it would be premature to dismiss juror no. 14 at that point as he was still an alternate.  R.T. 1897.  However, the court asserted that it would revisit the issue if anything changed.

Juror no. 14 did not ultimately participate in deliberations, and there does not appear to be any further discussion of the issue in the record.

**B.     State Appellate Court Decision**

Before the state appellate courts, Polk argued that the trial court's failure to conduct an adequate inquiry into potential misconduct and/or the receipt of extrinsic information constituted error under state law and violated his due process rights.  Polk contended that it was indeed misconduct for juror no. 14 to discuss his recognition of a person featured in a photograph in evidence because state law prohibited him from discussing with other jurors

33

1   any subject connected with the trial.  He further argued that juror no. 14's exposure of

2   seated juror no. 7 to the information was prejudicial because seated juror no. 7 could have

3   learned that Polk was "partying with a big-time pimp."  He suggested that juror no. 7 could

4   have inferred this merely from the fact that juror no. 14 told juror no. 7 that he recognized a

5   person in one of the prosecution's photos from a documentary.  Polk assumed that the

6   mention of juror no. 14's recognition of a person in a photograph from a documentary alone

7   was sufficient to result in prejudice, and argued that the seated juror did not need to be told

8   the name of the documentary or hear the word "pimp" in order to infer the worst.  Polk

9   further argued that juror no. 14's discussion with the court also likely made other jurors

10  suspicious.

11      The California Court of Appeal denied Polk's claim, ruling that under state law, "[n]ot

12  every incident involving a juror's conduct requires or warrants further investigation," and

13  that such a decision was within the discretion of the trial judge.  The court noted that under

14  California law, "[a] hearing is required only where the court possesses information which, if

15  proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his

16  duties and would justify removal from the case."  It held that the trial court reasonably

17  concluded that no further investigation or hearing was necessary, reasoning:

18      The record merely indicates that Juror No. 14 told Juror No. 7 that he
19      recognized someone from one of the photographs as having been in a
        documentary. Juror No. 14 did not identify the photograph and did not say
20      who he recognized. He did not mention the name of the documentary and he
        did not mention the name Fillmore Slim. On this meager record, we conclude
21      the court did not abuse its discretion when it concluded further inquiry was not
        necessary.

22
23      The court further suggested that juror no. 14 did not commit misconduct, finding that,

24  "[i]t  would be difficult to characterize the apparently brief and vague conversation that

25  occurred here as misconduct."  However, even if there was misconduct, the court held that

26  any presumption of prejudice was rebutted by the court's examination of the entire record

27  and its resulting determination that "there [was] no reasonable probability of actual harm

28  from the misconduct at issue here."

34

The California Supreme Court summarily denied review.

**C.      Parties' Arguments**

Polk contends that the trial court's failure to interview juror no. 7 regarding the impact of the information on him and whether he had in turn passed the information on to other jurors violated his due process rights. *See Grotemeyer v. Hickman*, 393 F.3d 871, 881 (9th Cir. 2004); *Caliendo v. Warden*, 365 F.3d 691, 698 (9th Cir. 2004). He suggests that such an interview or inquiry should have taken place at a further hearing on the matter, and that a further hearing was indeed required. Polk additionally argues that the trial court's finding that the information received by juror no. 7 was not prejudicial was also unreasonable, and argues that whether Polk was a pimp was a central issue to his credibility. He contends that if the information led juror no. 7 to believe that Polk was a pimp, then it would have impacted juror no. 7's view of Polk's credibility, thus "tipp[ing] the scale" in "a very close case."

In opposition, the state argues that the trial court adequately investigated any potential jury misconduct and/or exposure to extrinsic information. It contends that there is no clearly established United States Supreme Court law requiring the trial court to conduct a further hearing in this case. *See Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005). It notes that the Ninth Circuit has adopted a flexible approach in determining what steps to take in response to a claim of juror misconduct, and that in this case, the trial court was neither required to dismiss juror no. 14 nor to question juror no. 7 regarding potential misconduct. *See Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003).

The state contends that it is unlikely that juror no. 14 could be said to have committed misconduct, but rather that the record shows that the juror demonstrated that he was conscientious when he submitted a note to the court and that he was aware of his duty to avoid exposure to extrinsic evidence. It further argues that juror no. 7 did not commit misconduct merely by listening to juror no. 14. Furthermore, even if juror no. 14's actions

35

could be considered improper, the state argues that there was no prejudice since juror no. 14 did not participate in deliberations.

Alternatively, even if juror no. 14 committed misconduct, the state argues Polk is not entitled to relief because the misconduct cannot be said to have prejudiced him such that he did not receive a fair trial. It notes that the jury had already heard evidence that Polk was involved in pimping, that he had two prior felony convictions for selling drugs, and that he had violated his probation by continuing to sell drugs while armed. It further notes that Polk himself admitted at trial that he never paid taxes on his income, that he had fathered four children with three women, and that he did not live with any of the women on a full-time basis. It argues that to the extent that juror no. 7 learned he was hanging out with a notorious pimp - and assuming passed it on to other jurors - such information would not have been prejudicial given the other evidence that Polk was not a model citizen.

Additionally, the state argues that the evidence against Polk was strong and that this was not a close case. It cites to eyewitness statements that Polk shot the victim several times at a point-blank range, and that Polk was the aggressor. It further argues that Polk's own testimony was highly implausible, and contends that any claim of self defense was weak. In sum, the state contends that there is no likelihood that the possibility that another juror learned that a photograph showed Polk with a notorious pimp, Fillmore Slim, would have resulted in a different verdict.

In his traverse, Polk contends that the information was "critical" to ascertain what exactly juror no. 14 said to juror no. 7 regarding Fillmore Slim because Polk's role as a pimp had taken on enormous significance in the case since Polk's credibility was key. Polk concedes that the United States Supreme Court has not specified exactly what is required under the circumstances. Nevertheless, he argues that the trial court's inquiry here would not have satisfied the requisite investigation under any definition. He contends that the trial judge was required to inquire of juror no. 7 what he had heard and the impact of the information on him. He argues that this case is distinguishable from *Tracey*, 341 F.3d at

36

1044, relied on by the state, because it involves extrinsic information as opposed to intrinsic bias.

Regarding prejudice, Polk argues that extrinsic evidence here regarding Fillmore Slim would have convinced juror no. 7 that Polk was lying on the witness stand about pimping, and, therefore, by extension, about self-defense. He disputes the state's characterization of the case, and contends that it was indeed a "close" one given that the jury deliberated for five days and asked for readbacks of testimony.

### D.   Legal Standards

*Juror Misconduct*

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012).

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror misconduct or bias is raised by the parties. *Tracey*, 341 F.3d at 1045 (citing *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)). Instead, "in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Id.* at 1044.

Evidence not presented at trial is deemed "extrinsic." *See Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). Jury exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. *See Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995). That the extrinsic evidence comes from a juror rather than a court official or other party does not diminish the scope of a defendant's rights under the Sixth Amendment. *See Jeffries*, 114 F.3d at 1490.

A juror's past personal experiences may be an appropriate part of the jury's deliberations. *Grotemeyer*, 393 F.3d at 879. Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict. *See id.* at 1669-72 (foreman's reference and reliance on her medical experience in comments to other jurors did not constitute introduction of extrinsic evidence in violation of 6th Amendment right to confrontation). However, in some instances a juror's personal experiences may constitute impermissible extrinsic evidence. *See id.* at 880; *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991). This is the case when: (1) a juror has personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict, or (2) the jury considers a juror's past personal experiences in the absence of any record evidence on a given fact. *See Navarro-Garcia* at 821-22; *see, e.g., Mancuso v. Olivarez*, 292 F.3d 939, 951-52 (9th Cir. 2002) (juror's personal knowledge of facts specific to defendant that were not part of the record constituted impermissible extrinsic evidence).

A petitioner is entitled to habeas relief only if it can be established that the exposure to extrinsic evidence had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *see Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993) (same). In other words, the error must result in "actual prejudice." *See Brecht*, 507 U.S. at 637.

Jury exposure to extrinsic evidence which by its nature was intrinsically prejudicial creates a presumption that the exposure had a substantial and injurious influence on the verdict. *See Jeffries*, 114 F.3d at 1489-92. Intrinsically prejudicial evidence generally regards the defendant or the alleged crimes and is relevant to his guilt or innocence. *See id.* (comment by one juror of defendant's excluded prior robbery conviction presumptively prejudicial given jury's adoption of two special findings that supported conviction for aggravated first degree murder and imposition of death sentences); *United States v. Harber*, 53 F.3d 236, 240-41 (9th Cir. 1995) (reliance by jury on government agent's

United States District Court
For the Northern District of California

1 | extrinsic summary of prosecution's evidence and opinion of defendant's guilt presumptively

2 | prejudicial).  The focus is on the nature of the evidence itself.  *See Jeffries*, 114 F.3d at

3 | 1490.

4 |       "No bright line test exists to assist courts in determining whether a petitioner has

5 | suffered prejudice from juror misconduct." *Mancuso*, 292 F.3d at 950.  However, a federal

6 | court should "place great weight on the nature of the extraneous information that has been

7 | introduced into deliberations." *Id.* (citing *Jeffries,* 114 F.3d at 1490).

8 |       *Factual Findings - 2254(d)*

9 |       Habeas relief is warranted only if the California Court of Appeal's decision "was

10 | based on an unreasonable determination of the facts in light of the evidence presented in

11 | the State court proceeding." 28 U.S.C. § 2254(d)(2).  The relevant question under §

12 | 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate

13 | review, could reasonably conclude that the state court findings are supported by the record.

14 | *Detrich v. Ryan*, 677 F.3d 958, 972 (9th Cir. 2012); *Lambert v. Blodgett*, 393 F.3d 943, 978

15 | (9th Cir. 2004).

16 | 

17 |       Challenges to state court findings pursuant to the "unreasonable determination"

18 | standard may arise in several ways, including where the finding is unsupported by sufficient

19 | evidence; where the state court should have made a finding of fact but neglected to do so;

20 | where the state court made findings of fact under a misapprehension of the correct legal

21 | standard; and where the fact-finding process itself was defective.  *See Taylor v. Maddox*,

22 | 366 F.3d 992, 999, 1000–01 (9th Cir. 2004).  Where a petitioner challenges the state

23 | court's findings based entirely on the state record, "[the court] must be particularly

24 | deferential to [the] state court [ ]," and defer to its factual findings unless it is "convinced

25 | that an appellate panel, applying the normal standards of appellate review, could not

26 | reasonably conclude that the finding is supported by the record." *Maxwell v. Roe*, 628 F.3d

27 | 486, 500 (9th Cir. 2010) (*quoting Maddox*, 366 F.3d at 999–1000). "This is a daunting

28 |

standard - one that will be satisfied in relatively few cases." *Id*; *see, e.g., De Weaver v. Runnels*, 556 F.3d 995, 1006–07 (9th Cir. 2009) (petitioner did not show unreasonable determination of facts by merely disagreeing with the state court's interpretation of the record but not pointing to any material fact that the court failed to consider in reaching its determination that the trial judge had not coerced the jury to reach a verdict); *cf. Detrich*, 677 F.3d at 981 (quoting *Maddox*, 366 F.3d at 1001) ("a state court unreasonably determines the facts when it "overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's claim").

### E.    Analysis

At the outset, Polk challenges the trial court's factual findings characterizing the nature of the extrinsic evidence that juror no. 14 shared with juror no. 7.  Polk argues (in a footnote) that the California Court of Appeal's finding that juror no. 14 did not mention the name of the documentary to juror no. 7 constituted an unreasonable determination of the facts in light of the evidence under § 2254(d)(2) and warrants no deference because in fact, juror no. 14 "did not recall" whether he told juror no. 7 the name of the documentary.     As set forth above, based on its examination of juror no. 14, the state court found that

> The record merely indicates that Juror No. 14 told Juror No. 7 that he recognized someone from one of the photographs as having been in a documentary. Juror No. 14 did not identify the photograph and did not say who he recognized. He did not mention the name of the documentary and he did not mention the name Fillmore Slim.

Polk explicitly challenges the trial court's finding that the juror did not mention the name of the documentary, "American Pimp," to juror no. 7.  Having reviewed the record, including the trial court's inquiry of juror no. 14, the court concludes that this finding was reasonably supported by the record and is entitled to deference.  It is true that initially juror no. 14 stated that he could not recall if he mentioned the name of the documentary, but he clarified in his response to the court's inquiry, which defense counsel requested the court make, and in a subsequent response that he did not believe he mentioned the name of the

United States District Court
For the Northern District of California

1   documentary.  R.T.  1895.

2       Moreover, to the extent that Polk implicitly challenges the state court's other related

3   factual findings, the court further concludes that they, too, are supported by the record.[8]

4   Accordingly, following an examination of juror no. 14, the trial court was left with the

5   following extrinsic evidence: that juror no. 14 told juror no. 7 that he recognized someone in

6   a photograph introduced into evidence at trial from a documentary film that he had seen.  In

7   affirming the trial court, the state appellate court presumably found juror no. 14 to be

8   credible in his account of the communications, and this court is required to afford such

9   credibility determinations the highest deference.  *See Knaubert v. Goldsmith*, 791 F.2d 722,

10  727 (9th Cir. 1985); *see Weaver v. Palmateer*, 455 F.3d 958, 963 n. 6 (9th Cir. 2006).

11      Based on the record and these findings, the court concludes that it was not

12  unreasonable for the state trial court to decline to hold a further hearing - or for the state

13  appellate court to affirm without holding a further hearing.  *See Tracey*, 341 F.3d at 1044.

14  The court further rejects Polk's suggestion that the Ninth Circuit's holding in *Tracey* does

15  not apply because *Tracey* involved juror bias as opposed to juror consideration of extrinsic

16  evidence.  Polk fails to recognize that the *Tracey* court specifically stated that it applied to a

17  claim of juror misconduct *or* bias.  *Id.*  Moreover, subsequent Ninth Circuit cases have

18  noted that *Tracey* applies in cases involving extrinsic evidence.  *See Bishop v. Contra

19  Costa Superior Court*, 223 Fed.Appx. 725, 729 (9th Cir. 2007) (citing to *Tracey* and its

20  standards regarding necessity of evidentiary hearing in case involving extrinsic evidence,

21  and concluding in habeas case that state court was not required to hold hearing);

22  *Thompson v. Woodford*, 377 Fed.Appx. 639 (9th Cir. 2010) (same, citing also to *Smith v.

23  Phillips*, 455 U.S. 209, 215 (1982)).

24      The court further concludes that the state court's prejudice determination was

25  reasonable.  This is not a case where the extrinsic evidence may be considered

26

27      [8]Many of Polk's arguments and his characterizations of the nature of the extrinsic
28  information are contrary to the state court's factual findings.

"intrinsically prejudicial" such that prejudice is presumed.  Contrary to Polk's arguments otherwise, the fact that juror no. 14 merely recognized someone in a photograph introduced at trial from a documentary film did not directly implicate Polk, nor was it relevant to his guilt or innocence.  Considering then the other pertinent factors, it was not unreasonable for the state court to conclude that the sharing of the information did not have a "substantial and injurious influence on the verdict."  *See Brecht*, 507 U.S. at 623.

Significantly, juror no. 14's statement to juror no. 7 was insufficiently prejudicial given the issues and the evidence in the case.  As for the impact that the information may have had on juror no. 7, the court notes that Polk makes numerous assumptions regarding the nature of the information that are not borne out by the record in this case.  Even assuming juror no. 7 passed on the fact that juror no. 14 recognized a person in a photograph from a documentary film to the other deliberating jurors, this information did not and could not have had the impact that Polk advocates.

Polk is correct that his credibility and that of the eyewitnesses played a significant role in the case.  However, the nature of the extrinsic evidence, as found by the state appellate court, neither directly nor indirectly impacted Polk's credibility.  Moreover, contrary to Polk's arguments otherwise, this was *not* a close case in terms of an acquittal versus a conviction.  Based on the evidence in the record regarding the deliberations, the close call for the jury was whether to convict Polk of first or second degree murder.

Given the above, the California Court of Appeal's determination that Polk was not entitled to relief on the juror misconduct claim was not unreasonable or contrary to clearly established United States Supreme Court law.  Additionally, the state court's findings were not objectively unreasonable in light of the evidence presented in the state court proceeding.

For these reasons, this claim fails.

**III.    Cumulative Impact of Errors**

Finally, Polk asserts that the cumulative effect of errors warrants relief.  "Cumulative error applies where although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  *Mancuso*, 292 F.3d at 957.  However, because there was no single constitutional error in this case, there can be no cumulative effect.

## CONCLUSION

For the foregoing reasons, Polk's petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

## CERTIFICATE OF APPEALABILITY

To obtain a COA, Polk must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that two issues presented by Polk in his petition meet the above standard and accordingly GRANTS the COA as to those issues.  *See generally Miller-El*, 537 U.S. at 322.  Those issues are:

(1) that his Fifth, Sixth, and Fourteenth Amendment due process, equal protection, and fair trial rights were violated when the prosecution peremptorily challenged eight potential jurors on the basis of their gender; and

(2)  that his Fifth, Sixth, and Fourteenth Amendment due process, equal protection, and fair trial rights were violated when the trial court failed to adequately investigate reported juror misconduct.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: September 25, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge

44